UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PERTRICEE HOLLINGTON,

                              Plaintiff,

          – against –

CDM FEDERAL PROGRAMS
CORPORATION,

                              Defendant.

**OPINION & ORDER**

22-cv-4940 (ER)

RAMOS, D.J.:

Pertricee Hollington brings this action under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the New York State Human Rights Law ("NYSHRL") to remedy discrimination and unlawful retaliation by his former employer, CDM Federal Programs Corporation ("CDM"). Doc. 25 ¶ 1. Pending before the Court is CDM's partial motion to dismiss with prejudice Hollington's discrimination and retaliation claims, to dismiss all of Hollington's NYSHRL claims, and to dismiss or transfer the remaining claims to the United States District Court for the Southern District of Texas ("SDTX") due to lack of personal jurisdiction and venue. Doc. 47. For the reasons set forth below, CDM's partial motion to dismiss Hollington's claims with prejudice is GRANTED, and its motion to transfer to the SDTX is likewise GRANTED.

I.      BACKGROUND

A.  The Parties

Pertricee Hollington is an African American man and a citizen of New York residing in Suffolk County. Doc. 25 ¶¶ 3, 5, 7. Beginning in August 2018, Hollington was employed by CDM as a project inspector in the critical infrastructure group at sites in Houston, Texas and Springfield, Missouri related to CDM's work for the Federal Emergency Management Agency ("FEMA"). *Id.* ¶¶ 7, 40. As an inspector, Hollington

was responsible for taking measurements and documenting damage, and would outline these observations in a report.  *Id* ¶ 21.

CDM is part of an organization that secures contracts with FEMA for work across the United States.  *Id.* ¶¶ 10–11.  It is incorporated in Massachusetts with its principal place of business in Boston, Massachusetts.  *Id.* ¶ 6.  It is registered with the New York Secretary of State to conduct business in New York, operating six offices throughout the State, including in Woodbury, Long Island, and New York City.  *Id.*

Hollington worked for CDM on a rotational basis.  CDM would assign Hollington to work for up to 45 days at a site outside of New York state, but permitted him to return to his residence for 10 days after each 45-day period.  *Id.* ¶ 13.  While on rotation, CDM paid for Hollington's lodging and provided him with per diem payments for meals and other expenses.  *Id.* ¶ 14.  CDM also paid for Hollington's trips to and from his residence in New York.  *Id.* ¶ 15.  Hollington alleges that such payments were provided because the rotations were understood to be temporary so that he did not have to change his residence in New York.  *Id.*  Even though Hollington only ever performed work outside of New York, CDM withheld New York taxes from Hollington's compensation.  *Id.* ¶ 12. Consequently, Hollington alleges that his employment was "based" at his residence in East Setauket, New York.  *Id.* ¶ 9.

**B.  The Alleged Acts**

In September 2017, CDM secured a contract with FEMA to provide services in Texas related to the damage caused by Hurricane Harvey.  *Id.* ¶ 16.  Hollington was assigned to work on this contract.  *Id.* ¶ 19.  He began his work with the critical infrastructure group in Houston, Texas on August 29, 2018[1] after completing one month of training in Austin, Texas.  *Id.* ¶¶ 18–19.  While working at the Houston site, Hollington

---

[1] Hollington does not say when he first began working for CDM, but this is the first assignment he discusses.

took approximately seven trips back to New York, each lasting at least ten days and paid for by CDM.  *Id.* ¶ 19.

At some point in the following month, September 2018, Hollington was the victim of racially-motivated harassment by his co-worker, Rick Lamb.  *Id.* ¶ 22.  Lamb allegedly "made false accusations about [Hollington's] performance and [] professionalism."  Doc. 48-2.  Hollington complained about the incident to CDM and FEMA.[2]  Doc. 25 ¶ 22.  The head of Houston FEMA division reported to Hollington that a FEMA investigation concluded that Hollington was in fact a victim of racially-motivated harassment.  *Id.* ¶ 23.  Gary Pannozzo, a senior program manager for CDM, told Hollington that others had also complained of Lamb's harassment of Hollington.  *Id.* ¶ 24.  He also told Hollington not to discuss the harassment complaint with FEMA, although Hollington had already done so.  *Id.* ¶ 26.  According to Hollington, CDM was "upset" that the issue was brought to FEMA's attention.[3]  *Id.* ¶ 27.

CDM transferred Lamb to a different office in Texas, where he retained the same role.  *Id.* ¶ 29.  CDM also assigned Hollington to a site inspector role outside of the critical infrastructure group.[4]  *Id.* ¶¶ 28, 30.

### 1. Demotion

Hollington alleges that his new role was a demotion.  *Id.*  His previous role in the critical infrastructure group addressed damage that was a priority.  *Id.*  It was a "highly respected" group, and it was assigned projects quickly due to the importance of its work.  *Id.*  Hollington preferred the critical infrastructure role over his newly assigned role, *id.*, and he "emphatically and explicitly" stated so.  *Id.* ¶ 30.  He had years of experience with

---

[2] Hollington does not say when or by what means he made these complaints to CDM and FEMA.

[3] Hollington does not say how CDM first discovered that he had complained to FEMA, i.e., whether he informed Pannozzo directly or whether CDM found out independently.

[4] Although he describes this role as "site inspector," Hollington previously described his role with CDM as "project inspector."  *Id.* ¶ 7.

FEMA work[5] and alleges that he was "more than qualified" for the inspector position and the critical infrastructure group.  *Id.* ¶ 17.  Especially in light of the fact that Lamb was transferred, Hollington asserts that there was no reason for him to be assigned a different role because Lamb's transfer presumably would have addressed the discrimination concerns.  *Id.* ¶ 29.

On September 22, 2018, Hollington filed a charge of discrimination with the EEOC based on the racial harassment incident as well as CDM's alleged retaliatory demotion.  *Id.* ¶ 31; Doc. 48-2.

### 2.  *Failure to Hire or Promote*

At some point after filing his first EEOC complaint, Hollington began to pursue a promotion to the Program Delivery Manager ("PDMG") position.  Doc. 25 ¶ 32.  PDMGs are responsible for all aspects of a project, from its initiation through FEMA's relief decision.  *Id.*  PDMGs, who manage project inspectors, are paid as much as 50% or more than project inspectors.  *Id.* ¶ 33.  Their assignments are longer and involve less time on their feet.  *Id.*  Accordingly, Hollington alleges that the position would have been "a significant promotion" for him.  *Id.* ¶ 34.

Hollington had completed the appropriate training course to become a PDMG and had a certificate stating that he was qualified for the position.  *Id.* ¶ 37.  His "years of experience on FEMA projects" also included positions that he described as "analogous" to the PDMG position.  *Id.*

CDM, according to Hollington, had "several opening[s]" for PDMG positions across the country between late 2018 through approximately January 2020.  *Id.* ¶ 35.  Of particular interest to Hollington were the PDMG positions near his residence in New York.  *Id.* ¶ 36.  Specifically, he was interested in the PDMG positions in Brooklyn, Manhattan, and the Bronx.  *Id.* ¶ 35.

---

[5] Hollington does not specify what "experience with FEMA work" means.

Hollington asserts that he applied to PDMG positions "across the country on multiple occasions," including to positions in Manhattan, "other locations in New York," and Missouri. *Id.* ¶¶ 36, 41. He also claims to have told his superiors at CDM, including personnel responsible for assignments, that he was interested in the PDMG positions in New York City. *Id.* ¶¶ 36, 43.

Despite his expressed interest and qualifications, CDM denied Hollington a promotion to the PDMG position. *Id.* ¶ 32. Hollington alleges that the individuals who received the PDMG positions were "less-qualified candidates." *Id.* ¶ 38. Hollington asserts than none of the "several individuals" that he is "aware of" were promoted to PDMG were Black and, to his knowledge, none had previously complained of discrimination or retaliation. *Id.* ¶ 39.

He further claims that all of the individuals promoted to PDMG while he was seeking the position had "less relevant experience than him." *Id.* ¶ 40. One such individual had started at CDM in August of 2018 with Hollington. *Id.* Yet, unlike Hollington, that individual was white, never complained about discrimination or retaliation, and "had no prior FEMA experience." *Id.* This individual was promoted to PDMG instead of Hollington. *Id.* However, Hollington does not specify which PDMG position this individual was promoted to; more specifically, it is unclear at which CDM location this individual was promoted or if Hollington had even applied to the same position.

Hollington also alleges that a different individual, who received the PDMG role in Missouri, also had "less experience with FEMA work" than him. *Id.* ¶ 41. Hollington had also applied to this Missouri position, but was not chosen. *Id.*

He asserts that there was "no legitimate reason" for CDM to pass him over for the PDMG positions. *Id.* ¶ 42. According to Hollington, CDM's failure to promote him was discrimination on the basis of race as well as retaliation for his prior complaints. *Id.* ¶¶ 38, 42.

Hollington also asserts that he applied to and expressed interest in "other positions"—besides the PDMG position—in Manhattan as well as "other positions in New York City." *Id.* ¶ 43.  He alleges that he was rejected from these positions as well, also due to retaliation and discrimination.  *Id.*

### 3.  Failure to Assign Work

After completing his Houston assignment in July 2019, Hollington alleges that he was one of the last inspectors at CDM to receive a new assignment, despite numerous job sites having availability at the time.  *Id.* ¶ 44.  Earlier, in the spring of 2019, CDM had sent Hollington and others an email detailing various upcoming positions, including at locations in Manhattan, other areas of New York, Puerto Rico, and the U.S. Virgin Islands.  *Id.* ¶ 45.  Hollington asserts that he had expressed interest in all of these positions.  *Id.* ¶ 46.  After email correspondence, Hollington understood that he was to be sent to Puerto Rico or the U.S. Virgin Islands following the completion of his Houston assignment.  *Id.*  However, Hollington does not provide any facts about the content of these emails nor when the correspondence occurred.

According to Hollington, CDM ultimately filled these and the other available positions across the country with other inspectors as retaliation against him. *Id.* ¶¶ 44, 46.  As a result, Hollington was at his home in New York from July 2019 through October 2019, "without employment" and awaiting an assignment from CDM. *Id.* ¶ 47.

### 4.  Assignment to Undesirable Location

In October 2019, CDM assigned Hollington to a site inspector role in Springfield, Missouri.  *Id.* ¶¶ 20, 48.  Hollington asserts that this assignment was "one of the least desirable jobs" available.[6]  *Id.* ¶ 48.  He alleges that this assignment was retaliation and discrimination by CDM.  *Id.*

---

[6] As noted above, Hollington asserts that he applied for a PDMG in Missouri, which he was denied because of discrimination and retaliation.

### 5. *Denial of Comparable Overtime*

While working at the Missouri site, Hollington wanted to work overtime hours, but he claims he received significantly less overtime than others at the site as a result of retaliation and discrimination by CDM. *Id.* ¶ 49.

### 6. *Manufacturing of False Complaints*

Also while at the Missouri site, Hollington claims that his CDM supervisor falsely told Hollington and his superiors that a FEMA agent had complained about Hollington's performance. *Id.* ¶ 51. That FEMA agent heard about the false complaint and informed Hollington that he had never complained about Hollington's performance. *Id.* ¶ 52. Hollington believes that his CDM supervisor manufactured the false complaint in order to establish a pretext for Hollington's termination. *Id.* ¶¶ 50, 53.

At numerous points in 2019, Hollington complained to CDM's human resources department about the alleged retaliation he had been experiencing since his initial discrimination complaint.[7] *Id.* ¶ 54. On January 24, 2020, Hollington once again filed a complaint with the EEOC alleging discrimination and retaliation by CDM. *Id.*; Doc. 48-3.

### 7. *Termination*

Hollington was at his home in New York from January 2020 through April 2020, after he completed the Missouri job. Doc. 25 ¶ 58. CDM fired Hollington in April 2020. *Id.* ¶ 55. Before his termination, Hollington had received an email from CDM detailing upcoming open positions. *Id.* ¶ 56. Accordingly, Hollington claims that he was fired in retaliation for his several complaints and discrimination based on race. *Id.*

### 8. *Blackballing*

Hollington remained in New York following his termination, applying to comparable positions in Manhattan, Brooklyn, Queens, Long Island, and other areas throughout the country. *Id.* ¶ 59. He claims that he has been unable to find other work

---

[7] Hollington does not provide the dates on which he made these complaints to human resources.

due to "blackballing" by CDM.  *Id.*  According to Hollington, CDM has been "falsely disparaging and defaming him in the industry," effectively preventing Hollington from finding other FEMA work.[8]  *Id.* ¶ 57.

### C. Procedural Background

Hollington alleges that these various acts, outlined above, are retaliation against him by CDM under § 1981, Title VII, and NYSHRL.[9]  He further alleges that those same acts constitute discrimination under § 1981 and Title VII.

Hollington initially brought this action in the Eastern District of New York ("EDNY").  Doc. 1 at 1.  After receiving CDM's motion to dismiss for failure to state a claim under the NYSHRL, Doc. 8 at 2, Hollington filed a First Amended Complaint.  Docs. 10, 11.  CDM subsequently filed a partial motion to dismiss and to transfer venue, Docs. 13, 15,  and in response Hollington filed a Second Amended Complaint.  Doc. 18.  Again, CDM filed a partial motion to dismiss under Rule 12(b)(6) for failure to state a claim and to transfer venue.  Doc. 19.

On March 6, 2022, Magistrate Judge Tiscione issued a Report and Recommendation—adopted in its entirety by the District Court—dismissing the complaint without prejudice for failure to establish venue in the EDNY.  R&R, Doc. 22; Doc. 24 at 2.  In the complaint at issue before Judge Tiscione, Hollington had only pled that he was denied positions "in New York" and "in New York City."  Doc. 22 at 11.  Judge Tiscione concluded that, while "it is clear . . . [that] venue is appropriate somewhere in New York" because "denial of job opportunities within a federal judicial district would be a significant event," Hollington must establish venue at the district-level.  *Id.* at 10.  Because Hollington failed to specify where in New York these positions

---

[8] Hollington does not provide any information concerning how, or to whom, CDM was disparaging him in the industry.

[9] On May 14, 2021, Hollington receive a Notice of Right to Sue from the EEOC.

were located, he could not sufficiently establish venue in the EDNY.[10]  *Id.* at 11.

Accordingly, Judge Tiscione dismissed Hollington's complaint without prejudice,

granting him leave to refile in a district with proper venue.[11]  *Id.* at 15.

      In his R&R, Judge Tiscione made a few additional findings.  First, he concluded

that CDM's failure to promote or hire Hollington to positions at its New York offices

would give rise to a "legally cognizable claim under the NYSHRL."  *Id.* at 8.  Second,

because CDM's denial of employment opportunities in New York was allegedly caused

by acts that occurred in Texas and Missouri, those Texas and Missouri facts could also be

raised in an NYSHRL claim.  *Id.* at 8–9.  Third, Judge Tiscione rejected Hollington's

argument that residence in New York was sufficient to establish a NYSHRL, nor was it

sufficient that Hollington felt the effects of retaliation at his home.  *Id.* at 9.  Thus, the fact

that Hollington was at his home in New York when he received notice of his termination

was not sufficient to establish an NYSHRL claim nor venue in the EDNY.  *Id.*

      Importantly, because venue was improper, Judge Tiscione did not rule on CDM's

Rule 12(b)(6) motion.  *Id.*  Accordingly, although a denial of employment opportunities

in New York would be a "legally cognizable" NYSHRL claim, Hollington still must

plead facts in his complaint that are sufficient to state a failure to hire or promote claim.

*Id*.

      On April 1, 2022, Hollington filed a Third Amended Complaint—the instant

complaint—along with an unopposed request to change venue to the SDNY.  Doc. 25;

Doc. 31.  At issue now is CDM's motion to dismiss with prejudice Hollington's

retaliation and discrimination claims as they relate to CDM's alleged failure to promote

or hire him, failure to assign him work, and blackballing of him.  If those claims are

---

[10] For the sake of clarity, the Court notes that Long Island, where Hollington lives, is in the EDNY.  In addition, "New York City" includes Brooklyn, which is in the EDNY, and Manhattan, which is in the Southern District of New York (SDNY).

[11] Judge Tiscione rejected CDM's motion to transfer venue to the SDTX because Hollington could conceivably establish venue in a New York district and "a transfer for Texas would be significantly inconvenient for [Hollington]."  *Id.* at 14.

dismissed, CDM also moves to dismiss with prejudice all NYSHRL retaliation claims for failure to state a claim.  CDM concedes, however, that the remaining § 1981 and Title VII retaliation and discrimination claims are sufficiently pled.  Doc. 48 at 20.  These claims include CDM demoting Hollington, assigning him to an undesirable work location, manufacturing false complaints against him, denying him overtime, and terminating him.  Although it conceded these claims are sufficiently pled, CDM further moves to transfer the case to the SDTX for failure to lay venue and lack of personal jurisdiction in the SDNY.

## II.    LEGAL STANDARD

### A.  Failure to State a Claim

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

### B.  Personal Jurisdiction and Venue

"The legal standard for a motion to dismiss for improper venue is the same as a motion to dismiss for lack of personal jurisdiction." *Casville Invs., Ltd. v. Kates*, 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)).  "When a defendant challenges either the jurisdiction or venue of the court, the plaintiff bears the burden of showing that both are proper." *Id.* (citing *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Savoy Senior Hous. Corp. v. TRBC Ministries*, 401 B.R. 589, 596 (S.D.N.Y. 2009).  To meet this burden, the plaintiff must plead facts sufficient for a *prima facie* showing of jurisdiction or venue. *Glasbrenner*, 417 F.3d at 355 (citing *CutCo Indus. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)).

## III.  DISCUSSION

### A.  Failure to State a Claim

Discrimination and retaliation claims are evaluated slightly differently.  Although neither party centers their arguments around this distinction, that distinction will guide the Court's analysis.

CDM only challenges the sufficiency of Hollington's § 1981, Title VII, and NYSHRL claims as they relate to his allegations that CDM failed to promote or hire him, failed to assign him work, and blackballed him.  Accordingly, the Court will only analyze the sufficiency of those specific allegations. CDM concedes that the other claims—those relating to the demotion, assignment to an undesirable location, denial of overtime, manufacturing of false complaints, and termination—are sufficiently plead.  Doc. 48 at 20; Doc. 50 at 9.

#### 1.  *Discrimination Claims*

Employment discrimination claims brought under § 1981 and Title VII are generally subject to the same pleading standards.[12] *Cardwell v. Davis Polk & Wardwell*

---

[12] Hollington does not bring a claim of discrimination under the NYSHRL.

*LLP*, No. 19 Civ. 10256 (GHW), 2020 WL 6274826, at *16 (S.D.N.Y. Oct. 24, 2020); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000). To establish a *prima facie* case for employment discrimination under § 1981 and Title VII, Hollington must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 247 (E.D.N.Y. 2015).

Hollington is African American, thus he is a member of a protected class. 42 U.S.C. §§ 2000e–2(a)(1) (listing "race" as a protected class). Further, he sufficiently pleads that he was qualified for his project inspector position, citing years of experience with FEMA work, Doc. 25 ¶ 17, and CDM does not suggest that Hollington's performance was inadequate. The Court thus finds that Hollington sufficiently alleges that he was qualified for his position at CDM.

Hollington's discrimination claims hinge upon whether he sufficiently alleges adverse employment actions that give rise to an inference of discrimination. An "adverse employment action" is one that causes a "materially adverse change in the terms and conditions of employment." *Galabya v. New City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "To be 'materially adverse,' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 2000)). Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (quoting *Crady*, 993 F.2d at 136); *see also Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

a.  *Failure to Promote and Hire*

A failure to promote may constitute an adverse employment action.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).  To make out a failure to promote or hire claim under § 1981 and Title VII, Hollington must demonstrate that:  (1) he is a member of a protected class; (2) he applied and was qualified for a job for which CDM was seeking applicants; (3) he was rejected despite being qualified; and (4) after this rejection, the position remained open and CDM continued to seek applicants with Hollington's qualifications.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Hughes v. Twenty-First Cent. Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018).  With respect to the third prong, the Second Circuit has held that a plaintiff must prove that he was "rejected under circumstances which give rise to an inference of unlawful discrimination."  *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998)).

As discussed above, Hollington is a member of a protected class.  Doc. 25 ¶ 7. Further, at least with regards to the PDMG positions, he sufficiently alleges that he was qualified for those positions by completing the appropriate training course, receiving a certificate of qualification, and having "years of experience on FEMA projects."  *Id.* ¶ 37. Finally, it is uncontested that Hollington was not hired for the positions he applied to. Because Hollington makes allegations regarding multiple positions at different locations, some instances of alleged discrimination will be analyzed separately.

i.  The Manhattan and Missouri PDMG Positions

Hollington must identify specific positions that he applied to.  *Brown*, 163 F.3d at 710.  Hollington identifies only two specific positions at locations that he actually applied to:  the PDMG positions in Manhattan and Missouri.[13]  Doc. 25 ¶¶ 36, 41.  Nonetheless,

---

[13] Hollington identifies other positions that he had applied to, but he does not state with specificity where these positions were located.  For example, he asserts that he applied to "other locations in New York" and "across the country."  Doc. 25 ¶ 36.  These claims are analyzed separately below.

Hollington fails to allege facts supporting a plausible inference of discriminatory motive in CDM's decision.

In the absence of an express discriminatory statement, a plaintiff may support an inference of discrimination by demonstrating that similarly situated employees outside of his protected class were treated more favorably. *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). Importantly, "[t]o support such an inference, a complaint 'must compare' the plaintiff to employees who are 'similarly situated in all material respects.'" *Brodt v. City of New York*, 4 F. Supp. 3d 562, 570 (S.D.N.Y. 2014) (quoting *Norville*, 196 F.3d at 95). The Second Circuit explained, "[t]he fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage." *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015).

However, Hollington makes only conclusory and vague allegations regarding who was ultimately hired to the Manhattan and Missouri PDMG positions; therefore, he cannot establish that these positions were filled by someone outside of his protected class. He alleges that none of the "several individuals" of which he is aware were promoted to PDMG while he was also seeking the position were Black and that all had "less relevant experience than him." Doc. 25 ¶¶ 39–40. With regard to the Missouri position, he further asserts that the individual had "less experience with FEMA work." *Id.* ¶ 41. But these assertions, in addition to being conclusory, are too vague to plausibly establish an inference of discrimination with regard to these PDMG positions specifically. Hollington does not identify these individuals by name, nor does he provide any information about them that would suggest they are "similarly situated in all material respects." *Brodt*, 4 F. Supp. 3d at 570. The mere fact that—as far as Hollington is "aware"—"several individuals" hired to PDMG were not Black fails to sufficiently establish that the individuals hired to the Manhattan and Missouri positions were not Black. Without more, Hollington cannot establish a plausible inference of discrimination, and the failure to

promote claim regarding the Manhattan and Missouri PDMG positions must be dismissed.

    ii.  The PDMG and Other Positions at Locations in New York and Across the Country

Hollington's assertions that he applied to PDMG positions in "other locations in New York" and "across the country," Doc. 25 ¶ 36, and to other non-PDMG positions in Manhattan and elsewhere, *id.* ¶ 43, are not sufficiently specific to state a failure to promote claim.  He either does not provide the specific position or job responsibilities, or he does not identify at which office or location the position was located.  Therefore, the Court must dismiss these claims.

Thus, all of Hollington's discrimination claims regarding CDM's failure to promote or hire him are dismissed.

    b.  *Failure to Assign Work*

CDM's failure to assign Hollington work between July 2019 and October 2019 is an adverse employment action because it left him "without employment" for that period, *Id.* ¶ 47, despite the fact that CDM had open positions at various worksites across the country.  *Id.* ¶ 45.  CDM's decision not to assign Hollington work, therefore, constitutes "significantly diminished material responsibilities" for Hollington and is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640 (referencing termination, a decrease in wages, and loss of material benefits as examples of a "materially adverse employment action"); *see also Feingold*, 366 F.3d at 152.

The failure to assign work claim, however, fails because Hollington does not sufficiently establish an inference of discrimination.  Hollington provides no facts suggesting that CDM's failure to assign him work was racially motivated.  There was no plausible suggestion, for example, that CDM only assigned work to individuals that were

not Black.  Accordingly, Hollington's discrimination claims must be dismissed as they relate to CDM's failure to assign him work.

>    c.  *Blackballing*

Hollington's blackballing claim likewise does not support an inference of discrimination.  He asserts only that he has been unable to find comparable work and that CDM has been "falsely disparaging and defaming him in the industry."  Doc. 25 ¶ 57. Not only is such an allegation conclusory, it provides no evidence of racially-based discrimination.  Accordingly, it must be dismissed.

Therefore, only the following § 1981 and Title VII discrimination claims are sufficiently pled, either as decided by this Court or as conceded by CDM:  (1) demoting Hollington out of the critical infrastructure group, (2) assigning him to an undesirable job in Missouri, (3) refusing to provide him with comparable overtime, (4) manufacturing false complaints against him, and (5) terminating him.

>    **2.  *Retaliation Claims***

Hollington's retaliation claims are analyzed slightly differently than his discrimination claims.  To state a claim for retaliation under § 1981, Title VII, and NYSHRL, Hollington must show that "(1) he engaged in a protected activity; (2) CDM was aware of this activity; (3) CDM took adverse employment actions against him; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013); *Asiedu v. Broadreach Med. Resources*, 19 Civ. 11825 (ER), 2022 WL 4237077, at *19 (S.D.N.Y. Sept. 13, 2022) (applying the same retaliation standard to § 1981, Title VII, and NYSHRL claims).

First, there is no question that by filing an EEOC complaint, Hollington engaged in protected activity.  Doc. 48-2; *see Mabry v. Neighborhood Defender Service*, 769 F. Supp. 2d 381, 396 (S.D.N.Y. 2011) ("It is well established that the filing of an EEOC complaint is a protected activity.").  Even without his official complaint to EEOC on

September 22, 2018, Hollington's previous complaint to CDM and FEMA after the discriminatory conduct of Rick Lamb would constitute protected activity.  *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (explaining that "informal protests" of discrimination, such as "making complaints to management," are protected activities).

Second, Hollington sufficiently alleges that CDM was aware of this initial complaint and his subsequent complaints to human resources.  To satisfy this requirement, Hollington is not required to show that individual decision-makers at CDM had knowledge of his protected activity; it is sufficient that CDM as a corporate entity had been put on notice of his complaint.  *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d. Cir. 2000).  Even before Hollington filed a complaint with EEOC, a senior program manager at CDM—Gary Pannozzo—instructed Hollington not to discuss his racial harassment complaint with FEMA.  Doc. 25 ¶ 26.  Soon after, CDM transferred Rick Lamb—the individual that harassed Hollington—to a different worksite.  *Id.* ¶ 29.  These actions by CDM—made in response to and in an attempt to address the complaint—demonstrate that it was aware of Hollington's protected activity.  Hollington further alleges that he complained directly to CDM's human resources department on multiple occasions throughout 2019 and filed a second complaint with EEOC in January 2020.  *Id.* ¶ 54.  Collectively, these facts sufficiently establish that CDM was aware that Hollington had complained about instances of racial discrimination and retaliation.

What remains for this Court to decide is whether Hollington meets the third and fourth prongs of the analysis, showing that a causal connection exists between alleged adverse actions and his engagement in protected activity.  While Hollington does allege some adverse employment actions, he fails to establish that CDM had a retaliatory motive when taking these actions.

a.  *Adverse Employment Actions*

Adverse actions in the retaliation context are defined more broadly than in the discrimination context.  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

64 (2006).  In contrast with Hollington's discrimination claims, adverse employment actions in the retaliation context are "not limited to discriminatory actions that affect the terms and conditions of employment."  *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. at 64.  Rather, in the retaliation context, an adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted).  Thus, actions must be considered "both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).  To make this showing, Hollington must "proffer objective indicia of material disadvantage; subjective, personal disappointment is not enough."  *Beyer v. County of Nassau,* 524 F.3d 160, 164 (2d Cir. 2008) (quoting *Williams v. R.H.  Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)) (internal quotation marks omitted).

The Court finds that CDM's failure to promote Hollington to the PDMG positions constitutes an adverse employment action.  The PDMG positions, as Hollington asserts, were paid up to 50% or more than Hollington's current role.  Doc. 25 ¶ 33.  PDMGs have more responsibilities, are given longer assignments, and spend less time on their feet. *Id.* ¶ 32–33.  The position would certainly constitute a promotion, and a reasonable employee might hesitate to complain of racial discrimination if it would jeopardize their ability to be promoted and receive higher pay.  *See Treglia*, 313 F.3d at 720 ("[Plaintiff's] claim of discriminatory failure to promote falls within the core activities encompassed by the term 'adverse actions.'").

CDM's failure to assign Hollington work between July and October 2019 can likewise constitute an adverse employment action.  Hollington asserts that CDM had various open positions in New York, Puerto Rico, and the U.S. Virgin Islands, yet nevertheless delayed in assigning him to a project for months.  Doc. 25 ¶¶ 44–45.  In fact, Hollington alleges that he had an understanding with CDM—made via email

correspondence[14]—that he would begin work in Puerto Rico or the U.S. Virgin Islands immediately after his Houston work completed in July 2019. *Id.* ¶ 46. Notwithstanding this understanding, CDM filled the positions with other inspectors. *Id.* ¶ 44. As a result, Hollington was "without employment" for a period of two months. *Id.* ¶ 47. As with a promotion, a reasonable employee might hesitate to complain of racial discrimination if they feared it would lead to temporary unemployment.

However, CDM's failure to hire Hollington for the "other positions" that he applied to, *id.* ¶ 43, does not constitute an adverse employment action because Hollington provides no evidence that a reasonable person would find such positions more desirable than his current role. Even if Hollington personally would have found those positions preferable, "a plaintiff's subjective feelings cannot be used to determine whether an employment action is adverse." *Jones v. N.Y. City Bd. of Educ.,* No. 09 Civ. 4815, 2012 WL 1116906, at *10 (S.D.N.Y. Apr. 2, 2012) (quoting *Islamic Soc'y of Fire Dep't Pers. v. City of New York,* 205 F. Supp. 2d 75, 84 (E.D.N.Y. 2002)).

CDM's alleged blackballing of Hollington also does not constitute an adverse employment. While blackballing might be deemed an adverse employment action in some contexts, Hollington does not supply facts establishing a plausible, non-conclusory blackballing claim. *See Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 343 (S.D.N.Y. 2009) (rejecting a blackballing claim because the plaintiff had not provided any evidence of communication between her previous and prospective employers); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("A Plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."). Hollington only provides a conclusory allegation that CDM falsely disparaged him in the industry.

---

[14] Hollington does not provide any specific details about when this email correspondence occurred. Nor does he provide any information about what CDM said to him in these emails.

Doc. 25 ¶ 57.  He does not provide any information concerning how, or to whom, CDM was disparaging him in the industry.

Accordingly, Hollington's retaliation claims rooted in CDM's failure to hire him to the "other positions" and CDM's blackballing must be dismissed because they do not sufficiently plead an adverse employment action.  His other retaliation claims—CDM's failure to promote him to PDMG and assign him work for a period of two months—sufficiently plead an adverse action.

  *b.   Retaliatory Motive*

Having established that CDM's failure to promote him to PDMG and failure to assign him work constitute adverse actions, Hollington must next establish that these adverse actions were causally linked to his complaint of racial discrimination, i.e., that CDM had a retaliatory motive.  A retaliatory motive is established when it contributes to an adverse employment action, even if it is not the sole cause of the action.  *Terry v. Ashcroft*, 336 F.3d 128, 140–41 (2d Cir. 2003).  But a retaliatory motive must be at least a "substantial" or "motivating factor" behind the adverse action.  *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Hollington can establish proof of causation either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.  *Gordon*, 232 F.3d at 117.  Showing that the retaliatory actions "closely followed" the protected activity or that there was a "reasonably close temporal proximity" can suffice.  *Summa*, 708 F.3d at 128.  While there is "no firm outer limit to the temporal proximity required . . . most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference." *Kraiem v. Jones Trading Institutional Services LLC*, 571 F. Supp. 3d 53, 60 (S.D.N.Y. 2021)

(internal quotation marks and citation omitted); *see also Brown*, 622 F. App'x at 20
(holding that time lapses ranging from two month to several years were "too attenuated"
to establish retaliatory motive).  While a time period of several days may establish the
requisite proximity, *Littlejohn*, 795 F.3d at 319–20, a lapse of three and a half months
may not, *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 86 (2d Cir. 1990).  In short, where
temporal proximity is the sole basis for demonstrating causation, the proximity must be
"very close."  *Olin v. Rochester City School District*, No. 18 Civ. 6006L (DGL), 2022 WL
967707, at *489 (W.D.N.Y. Mar. 31, 2022) (quoting *Farooq v. City of New York*, 2022
WL 793117, at *4 (2d Cir. 2022) (collecting cases, and finding that a five-month gap,
standing alone, is insufficient to show causation)).

 Here, Hollington only provides one piece of direct evidence suggesting retaliatory
animus.  He asserts that Gary Pannozzo, a senior program manager for CDM, told
Hollington not to discuss his complaint with FEMA.  Doc. 25 ¶ 26.  According to
Hollington, CDM was "upset" because he had already told FEMA.  *Id.* ¶ 27.  Hollington
does not state when his conversation with Pannozzo occurred, however context suggests
that it occurred shortly after the alleged racial harassment in September 2018.  While this
conversation does suggest that CDM was unhappy with Hollington for complaining to
FEMA, it does not necessarily suggest that CDM intended to retaliate against
Hollington—especially given the unclear temporal gap between this conversation and the
alleged failure to promote and failure to assign work claims.

 Regarding the failure to promote claim, Hollington does not say when CDM
denied him a promotion.  Hollington only states that CDM posted openings for the
PDMG and other positions in January and July of 2019, and that he applied to these
positions.  *Id.* ¶ 43.  Even assuming that Hollington applied immediately after the PDMG
positions were initially posted in January 2019 and CDM promptly denied him the
promotion, that alleged retaliation would be almost four months after he made his initial
complaint to FEMA and CDM in September of 2018, *id.* ¶ 22, and at least three months

after he filed his first EEOC complaint on September 22, 2018, Doc. 48-2. These temporal gaps are too long to establish a retaliatory motive, especially given that it is not even clear from the complaint whether Hollington actually applied to and was rejected from the PDMG position in January 2019. *See Hollander*, 895 F.2d at 86 (holding that a three-and-a-half-month temporal gap was too long to establish retaliatory motive).

Hollington might also establish sufficient temporal proximity by reference to his various protected complaints made to CDM's human resources department. Yet Hollington does not say when these complaints were made; he only states that he made them "in 2019." Doc. 25 ¶ 54. Without more information, temporal proximity with the human resources complaints may not be used as a basis to establish retaliatory motive. Therefore, the retaliation claims, as they relate to CDM's failure to promote Hollington to PDMG, must be dismissed.

The retaliation claims relating to CDM's failure to assign Hollington work must be dismissed for similar reasons. Hollington does specifically assert that this act occurred between July 2019 and October 2019. *Id.* ¶¶ 19–20, 44. But that is approximately one year after his complaints to CDM, FEMA, and EEOC, which is far too attenuated to establish retaliatory motive. *See Brown*, 622 F. App'x at 20. Again, CDM's failure to assign work might be sufficiently close in time to Hollington's human resources complaints throughout 2019; but, as explained above, he does not assert when such complaints were made. Because the Court may not presume such facts, the retaliation claim relating to CDM's failure to assign work must also be dismissed.

Therefore, only the following § 1981, Title VII, and NYSHRL retaliation claims are sufficiently pled, either as decided by this Court or as conceded by CDM: (1) demoting Hollington out of the critical infrastructure group, (2) assigning him to an undesirable job in Missouri, (3) refusing to provide him with comparable overtime, (4) manufacturing false complaints against him, and (5) terminating him.

### B.  NYSHRL Jurisdiction

CDM argues that the remaining retaliation claims do not state a claim under NYSHRL and must be dismissed.  For the foregoing reasons, the Court agrees and dismisses all NYSHRL retaliation claims.

The NYSHRL does not cover unlawful acts committed by foreign defendants outside of New York against New York residents.  *Hardwick v. Auriemma*, 983 N.Y.S. 2d 509, 511 (N.Y. App. Div. 1st Dept. 2014).  A plaintiff's mere residence in New York is not sufficient to establish a NYSHRL claim.  *Sherwood v. Olin Corp.*, 772 F. Supp. 1418, 1425–26 (S.D.N.Y 1991).  The NYSHRL does, however, "afford protections . . . [to] plaintiffs who can 'plead and prove that the alleged discriminatory [or retaliatory] conduct had an impact' within [New York] . . . .'"  *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (quoting *Hoffman v. Parade Publ'ns*, 15 N.Y. 3d 285, 289 (2010)).

CDM is a foreign corporation, Doc. 25 ¶ 6, thus Hollington's NYSHRL retaliation claims may only survive if he adequately pleads that the retaliatory acts occurred in New York or that their impacts were felt in New York.  A retaliatory act has an "impact" in New York when it "affected the terms, conditions, or privileges of [the plaintiff's] employment in New York."  *Sherwood,* 772 F. Supp. at 1426; *see also Harte v. Woods Hole Oceanographic Instn.*, No. 10 Civ. 3916 (RJD) (MDG), 2012 WL 12951525, at *4 (E.D.N.Y. Jan. 6, 2012), *aff'd*, 495 Fed. Appx. 171 (2d Cir. 2012) (unpublished); *King v. Aramark Services, Inc.*, No. 19 Civ. 77 (GWC), 2019 WL 3428833, at *15 (W.D.N.Y. July 30, 2019).

The NYSHRL retaliation claims regarding the demotion, undesirable assignment to Missouri, reduced overtime hours, and false complaints do not involve acts committed in New York nor acts that impacted Hollington in New York.  All of these acts occurred in and impacted Hollington in Texas or Missouri.  Hollington argues that because he "felt the emotional distress related to the retaliatory conduct" while he was periodically at his

residence in New York, the NYSHRL covers all of CDM's alleged retaliatory acts. Doc. 49 at 19.  But merely experiencing the emotional distress of retaliatory conduct while physically in New York cannot on its own establish NYSHRL jurisdiction. *See* R&R, Doc. 22 at 9; *Harte*, 2012 WL 12951525, at *5 ("[T]here exists no support for the notion that a plaintiff may bring a discrimination claim under the NYSHRL based upon a foreign corporation's conduct outside of New York affecting the terms of the plaintiff's employment outside of New York, but whose effects waft into New York because the plaintiff happens to live there.").  If that were the law, any plaintiff who happens to be in New York—for work or otherwise—when they learn of or feel the aftermath of retaliatory acts would be able to bring a claim under the NYSHRL. *See* R&R, Doc. 22 at 9.

Unlike the other alleged retaliatory acts, CDM's termination of Hollington does have at least some connection to New York.  CDM informed Hollington of his termination while he was at his residence in Suffolk County; thus, Hollington argues that the impact of his termination was felt in New York.  However, merely being at home in New York when learning of his termination is not sufficient to establish a NYSHRL claim.[15]  Hollington's residence is irrelevant to the impact inquiry.  *Sherwood*, 772 F. Supp. at 1425–26.  The relevant location in the impact inquiry is Hollington's place of employment, not his residence.  *Cf. Robles v. Cox and Co., Inc.*, 841 F. Supp. 2d 615, 625 (E.D.N.Y. 2012) (discussing the impact analysis under New York City Human Rights Law); *Shiber v. Centerview Partners LLC*, No. 21 Civ. 3649 (ER), 2022 WL 1173433, at *3 (S.D.N.Y. Apr.  20, 2022) ("The impact requirement—as applied under the NYCHRL—also applies under the NYSHRL . . .").

---

[15] In fact, in his Report and Recommendation, Judge Tiscione explicitly states that merely being at one's residence in New York when receiving notice of an adverse employment action is insufficient to bring a claim under the NYSHRL.  R&R, Doc. 22 at 9.

Hollington, however, does not sufficiently plead that his employment with CDM was based in New York.  In fact, he never alleges that he performed *any* work for CDM in New York.  Hollington did spend approximately 20% of his time in New York while employed by CDM, but every time Hollington was in New York, he was either on break from work or not employed.  Doc. 25 ¶¶ 13, 47, 58.  All of the work that Hollington describes in his complaint occurred in Austin, Houston, or Springfield.  *Id.* ¶¶ 18–20.  Certainly then, Hollington—who does not claim to have performed any work at all in New York—cannot be said to have been employed in New York.  *See King*, 2019 WL 3428833, at *15 (holding that a New York resident who primarily worked out-of-state but occasionally worked from her home in New York was "not employed in New York"); *Meyers v. Medco Health Solutions, Inc.*, No. 9 Civ. 09216 (RKE), 2012 WL 4747173, at *5 (S.D.N.Y. Oct. 4, 2012) (same).

The fact that CDM withheld New York taxes from Hollington's paycheck is not relevant.  All persons with a permanent New York address must pay New York taxes, regardless of where they are employed, N.Y. Tax Law 605(b)(1)(A), and New York's First Department has directly declined to apply the NYSHRL solely on the basis that a plaintiff paid New York taxes, *Benham v. eCommission Sols., LLC*, 118 A.D.3d 605, 606 (1st Dep't 2014).

Because Hollington's employment was not based in New York, the "terms, conditions, or privileges" of his employment *in New York* could not have been impacted by CDM's alleged retaliation.  *King*, 2019 WL 3428833, at *15.  Without an impact in New York, Hollington's retaliatory termination claim cannot be brought under the NYSHRL.  All of Hollington's NYSHRL retaliation claims are therefore dismissed.  His retaliation claims may only proceed under § 1981 and Title VII.[16]

---

[16] As Judge Tiscione concludes in his R&R, Hollington's failure to hire or promote claims, so far as they relate to positions in New York, would likely be sufficient to establish NYSHRL jurisdiction.  Doc. 22 at 8.  CDM concedes this point.  Doc. 48 at 25; Doc. 50 at 8.  However, as the Court discussed above, the failure

### C.  Leave to Amend

CDM asks the Court to dismiss these discrimination and retaliation claims with prejudice.  The Court grants that request.

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)).  However, Hollington has already had the opportunity to amend his complaint three times.  His first two amended complaints, although not in response to a court ruling, were filed after Hollington received CDM's briefed motions to dismiss.  In those motions, CDM specifically challenged the sufficiency of Hollington's failure to promote and hire claims, Doc. 13 at 1–2, as well as his NYSHRL claims.  Doc. 8 at 2; Doc. 13 at 1–2.  One of those motions specifically requested that the case be transfer to the SDTX.  *Id.* at 3–4. While CDM's Rule 12(b)(6) motion is addressed for the first time today,[17] Hollington has had multiple opportunities to enhance his factual allegations in response to CDM's arguments and Judge Tiscione's R&R.  Nevertheless, Hollington fails to supply sufficient facts to state a claim under Rule 12(b)(6).  The Court thus concludes than any further amendments would be futile and dismisses these claims with prejudice.

### D.  Transfer

CDM argues that, if Hollington's claims regarding New York positions are dismissed with prejudice, the entire case must be dismissed or transferred for lack of personal jurisdiction and improper venue in the SDNY.  Given the dismissal of those

---

to hire or promote claims were not sufficiently pled, so they may not be used as a basis for establishing a NYSHRL claim.

[17] Judge Tiscione's did not reach CDM's Rule 12(b)(6) motion in his R&R.  Doc. 22 at 9.

claims with prejudice, the Court agrees that it lacks personal jurisdiction over CDM and that venue is improper in the SDNY, and transfers the remaining claims to the SDTX.

"Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013). Whether venue is "improper" is governed by 28 U.S.C. § 1391.  *Id.*  Section 1391 provides that venue is proper in the chosen forum if:  (1) at least one defendant resides in the district and all the defendants reside in the same state in which the district is located; (2) a "substantial part" of the events giving rise to the claim occurred in the district; or (3) a defendant is subject to personal jurisdiction in the district and "there is no district in which an action may otherwise be brought."  28 U.S.C. § 1391(b).

Here, venue is not proper in the SDNY under § 1391(b)(1) because CDM does not reside in the SDNY.  Residence for a corporation under the venue statute is defined by which judicial districts CDM would be subject to either general or specific personal jurisdiction in the SDNY.  *See* 28 U.S.C. §§ 1391(c)(2), (d).  Except in truly exceptional cases, the Court has general jurisdiction over a corporation only where it is incorporated or maintains its principal place of business.  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  CDM is incorporated in Massachusetts with its principal place of business in Boston, Massachusetts.  Doc. 25 ¶ 6.  Therefore, CDM is not subject to general personal jurisdiction in the SDNY.

Specific personal jurisdiction over a defendant exists where the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum."  *Daimler*, 571 U.S. at 127 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Although CDM has an office in Woodbury, New York and offices elsewhere in New York City, Doc. 25 ¶ 6, that does not suffice to establish specific jurisdiction in the SDNY.  For the purposes of the venue statute, Hollington's claims would have to arise out of these

offices.[18]  As discussed above, all of Hollington's sufficiently pled claims arise out of

Houston, Texas or Springfield, Missouri—not New York.  Accordingly, CDM is not

subject to the Court's specific personal jurisdiction in the SDNY and does not "reside" in

the SDNY for the purposes of § 1391(b)(1).

Venue is also not proper in the SDNY under § 1391(b)(2).  All sufficiently pled

claims occurred in either Houston, Texas or Springfield, Missouri.  Therefore, it cannot be

said that a substantial part of the events giving rise to Hollington's claims occurred in

New York, as required for venue to be proper under § 1391(b)(2).  *See Gulf Ins. Co. v.*

*Glasbrenner*, 417 F.3d 353, 357 (2d. Cir. 2005) ("[F]or venue to be proper, significant

events or omissions material to the plaintiff's claim must have occurred in the district in

question.").

Finally, venue is not proper under § 1391(b)(3) because CDM is not subject to

personal jurisdiction in the SDNY, as explained above.

Accordingly, because this Court lacks personal jurisdiction over CDM and venue

is not proper, CDM asks the court to transfer the case to the SDTX pursuant to 28 U.S.C.

§ 1406 (a).  Under § 1406(a), the Court "shall dismiss, or if it be in the interest of justice,

transfer such case to any district or division in which it could have been brought."

28 U.S.C. § 1406(a).  "Whether dismissal or transfer is appropriate lies within the sound

discretion of the district court."  *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir.

1993).  The purpose of § 1406(a) is to "avoid[] the injustice which [has] often resulted to

plaintiffs from dismissal of their actions merely because they had made an erroneous

guess with regard to the existence of some elusive fact of the kind upon which venue

provisions often turn."  *Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992)

(internal quotation marks omitted) (quoting *Goldlawr v. Heiman*, 369 U.S. 463, 466

(1962)).  Section 1406(a) has been interpreted broadly to "authorize the transfer of cases,

---

[18] Additionally, Woodbury is in the EDNY, not the SDNY.  Hollington's claims would have to arise out of a
CDM office in the SDNY.

however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not." *Gibbons v. Fronton*, 661 F. Supp. 2d 429, 434 (S.D.N.Y. 2009) (citing *Corke v. Sameiet M.S. Song of Norway*, 572 F.2d 77, 79 (2d Cir. 1978)).  However, the Second Circuit has held that a transfer should not be granted when it would "reward plaintiffs for their lack of diligence in choosing a proper forum" and allow them to "bargain hunt" forums after they commenced the action.  *Spar*, 956 F.2d at 394–95 (2d Cir. 1992).

Because the Court dismisses with prejudice Hollington's claims regarding New York positions, Hollington cannot plead any additional facts that establish venue or personal jurisdiction in the SDNY—or any New York judicial district.  The Court therefore grants CDM's motion to transfer the remaining claims to the SDTX where both personal jurisdiction and venue are sufficiently established.

## IV.    CONCLUSION

CDM's partial motion to dismiss or narrow Hollington's claims is GRANTED.  The dismissed claims are dismissed with prejudice.  CDM's motion to transfer to the SDTX is GRANTED.  The Clerk of the Court is respectfully directed to transfer this action to the United States District Court for the Southern District of Texas.  This Order closes the case in the United States District Court for the Southern District of New York.  It is SO ORDERED.


Dated:   March 10, 2023
         New York, New York

 

_____
EDGARDO RAMOS, U.S.D.J.